**WO**

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| Louis Boehm, | No. CV-22-00561-PHX-DWL |
| Plaintiff, | **ORDER** |
| v. | |
| Commissioner of Social Security Administration, | |
| Defendant. | |

Plaintiff Louis Joseph Boehm challenges the denial of his application for benefits under the Social Security Act ("the Act") by the Commissioner of the Social Security Administration ("Commissioner"). The Court has reviewed Plaintiff's opening brief (Doc. 10), the Commissioner's answering brief (Doc. 11), and Plaintiff's reply (Doc. 12), as well as the Administrative Record ("AR"), and now affirms the Administrative Law Judge's ("ALJ") decision.

I.  Procedural History

On February 12, 2019, Plaintiff filed an application for disability and disability insurance benefits, alleging disability beginning on November 26, 2018. (AR at 13.) The Social Security Administration ("SSA") denied Plaintiff's application at the initial and reconsideration levels of administrative review and Plaintiff requested a hearing before an ALJ. (*Id.*) On March 2, 2022, following a hearing, the ALJ issued an unfavorable decision. (*Id.* at 10-24.) The Appeals Council later denied review, and the ALJ's decision became the final. (*Id.* at 1-6.)

II. <u>The Sequential Evaluation Process and Judicial Review</u>

To determine whether a claimant is disabled for purposes of the Act, the ALJ follows a five-step process. 20 C.F.R. § 404.1520(a). The claimant bears the burden of proof on the first four steps, but the burden shifts to the Commissioner at step five. *Tackett v. Apfel*, 180 F.3d 1094, 1098 (9th Cir. 1999). At the first step, the ALJ determines whether the claimant is presently engaging in substantial gainful activity. 20 C.F.R. §404.1520(a)(4)(i). At step two, the ALJ determines whether the claimant has a "severe" medically determinable physical or mental impairment. 20 C.F.R. § 404.1520(a)(4)(ii). At step three, the ALJ considers whether the claimant's impairment or combination of impairments meets or medically equals an impairment listed in Appendix 1 to Subpart P of 20 C.F.R. Part 404. 20 C.F.R. § 404.1520(a)(4)(iii). If so, the claimant is automatically found to be disabled. *Id.* At step four, the ALJ assesses the claimant's residual functional capacity ("RFC") and determines whether the claimant is still capable of performing past relevant work. 20 C.F.R. § 404.1520(a)(4)(iv). If not, the ALJ proceeds to the fifth and final step, where she determines whether the claimant can perform any other work in the national economy based on the claimant's RFC, age, education, and work experience. 20 C.F.R. § 404.1520(a)(4)(v). If not, the claimant is disabled. *Id.*

An ALJ's factual findings "shall be conclusive if supported by substantial evidence." *Biestek v. Berryhill*, 139 S. Ct. 1148, 1153 (2019). The Court may set aside the Commissioner's disability determination only if it is not supported by substantial evidence or is based on legal error. *Orn v. Astrue*, 495 F.3d 625, 630 (9th Cir. 2007). Substantial evidence is relevant evidence that a reasonable person might accept as adequate to support a conclusion considering the record as a whole. *Id.* Generally, "[w]here the evidence is susceptible to more than one rational interpretation, one of which supports the ALJ's decision, the ALJ's conclusion must be upheld." *Thomas v. Barnhart*, 278 F.3d 947, 954 (9th Cir. 2002) (citations omitted). In determining whether to reverse an ALJ's decision, the district court reviews only those issues raised by the party challenging the decision. *Lewis v. Apfel*, 236 F.3d 503, 517 n.13 (9th Cir. 2001).

III. The ALJ's Decision

At step one, the ALJ found that Plaintiff had not engaged in substantial, gainful work activity since the alleged onset date. (AR at 15.) At step two, the ALJ determined that Plaintiff has following medically determinable impairments: Burkitt's lymphoma, pancytopenia, neuropathy, hyperlipidemia, hypothyroidism, obesity, shingles, and sciatica. (*Id.*) However, the ALJ also determined that those medically determinable impairments were not severe under the meaning of the Act. (*Id.* at 15-19.) In reaching this determination, the ALJ evaluated Plaintiff's symptom testimony, concluding that Plaintiff's "statements concerning the intensity, persistence and limiting effects of [his] symptoms are not entirely consistent for the reasons explained in this decision." (*Id.* at 17.) The ALJ also evaluated opinion evidence from various medical sources, concluding as follows: (1) Sumeet Mendonca, M.D., treating provider ("unpersuasive" or "less persuasive"); (2) J. Fahlberg, M.D., state agency consultant ("persuasive"); and (3) K. Shelman, M.D., state agency consultant ("persuasive"). (*Id.* at 18-19.) Finally, the ALJ "considered the third party function reports completed by the claimant's family and friends, Ann Boehm, Mary Davis, Barbara Bettlack, and Susan Graham, . . . [but found] that they do not warrant a modification to this decision." (*Id.* at 19.) Thus, the ALJ concluded that Plaintiff is not disabled. (*Id.* at 19.)

IV. Discussion

Plaintiff presents three issues on appeal: (1) whether the ALJ erred when characterizing the severity of his impairments at step two; (2) whether the ALJ erred when analyzing Dr. Mendonca's opinions; and (3) whether the ALJ erred when discrediting his symptom testimony. (Doc. 10 at 1.) As a remedy, Plaintiff seeks a remand for calculation of benefits pursuant to the credit-as-true rule. (*Id.* at 15.)

Below, the Court begins by addressing Plaintiff's challenges to the evaluation of the medical opinion evidence and his symptom testimony, because the resolution of the other challenge on appeal—Plaintiff's challenge to the ALJ's step-two severity evaluation—turns in part on the resolution of his other challenges.

A. **The ALJ's Evaluation Of Dr. Mendonca's Medical Opinions**

1. Standard Of Review

In January 2017, the SSA amended the regulations concerning the evaluation of medical opinion evidence. *See Revisions to Rules Regarding Evaluation of Medical Evidence*, 82 Fed. Reg. 5844 (Jan. 18, 2017). The new regulations apply to applications filed on or after March 27, 2017, and are therefore applicable here. The new regulations provide in relevant part as follows:

> We will not defer or give any specific evidentiary weight, including controlling weight, to any medical opinion(s) or prior administrative medical finding(s), including those from your medical sources . . . . The most important factors we consider when we evaluate the persuasiveness of medical opinions and prior administrative medical findings are supportability . . . and consistency . . . .

20 C.F.R. § 416.920c(a).[1] Regarding the "supportability" factor, the new regulations explain that the "more relevant the objective medical evidence and supporting explanations presented by a medical source are to support his or her medical opinion(s), . . . the more persuasive the medical opinions . . . will be." *Id.* § 404.1520c(c)(1). Regarding the "consistency" factor, the "more consistent a medical opinion(s) . . . is with the evidence from other medical sources and nonmedical sources in the claim, the more persuasive the medical opinion(s) . . . will be." *Id.* § 404.1520c(c)(2)

Recently, the Ninth Circuit confirmed that the "recent changes to the Social Security Administration's regulations displace our longstanding case law requiring an ALJ to provide 'specific and legitimate' reasons for rejecting an examining doctor's opinion." *Woods v. Kijakazi*, 32 F.4th 785, 787 (9th Cir. 2022). Thus, "the former hierarchy of medical opinions—in which we assign presumptive weight based on the extent of the doctor's relationship with the claimant—no longer applies. Now, an ALJ's decision, including the decision to discredit any medical opinion, must simply be supported by

---

[1] Other factors that may be considered by the ALJ in addition to supportability and consistency include the provider's relationship with the claimant, the length of the treatment relationship, the frequency of examinations, the purpose and extent of the treatment relationship, and the specialization of the provider. 20 C.F.R. § 416.920c(c).

- 4 -

substantial evidence." *Id.* With that said, "[e]ven under the new regulations, an ALJ cannot reject an examining or treating doctor's opinion as unsupported or inconsistent without providing an explanation supported by substantial evidence. The agency must articulate how persuasive it finds all of the medical opinions from each doctor or other source and explain how it considered the supportability and consistency factors in reaching these findings." *Id.* at 792 (cleaned up). Although an "ALJ can still consider the length and purpose of the treatment relationship, the frequency of examinations, the kinds and extent of examinations that the medical source has performed or ordered from specialists, and whether the medical source has examined the claimant or merely reviewed the claimant's records . . . the ALJ no longer needs to make specific findings regarding these relationship factors . . . ." *Id.*

2.   Dr. Mendonca's Opinions

Plaintiff's treating oncologist, Dr. Sumeet Mendonca, submitted two medical source statements regarding Plaintiff's condition. (AR at 1405-10, 1500–04.) In an October 2019 statement, Dr. Mendonca noted that Plaintiff's Burkitt's lymphoma was stable as of the last evaluation, although Plaintiff still required monitoring. (*Id.* at 1406.) Dr. Mendonca also stated that Plaintiff experienced bone and joint pain, fatigue, and neuropathy. (*Id.*) Dr. Mendonca indicated that Plaintiff's fatigue, neuropathy, and deficient focus were side effects of his medication. (*Id.*) Dr. Mendonca also found that Plaintiff could walk a quarter mile before needing to rest or experiencing severe pain; that Plaintiff could sit for more than two hours and stand for 30 minutes before needing to sit; that Plaintiff had moderate limitations in his ability to pay attention or concentrate on tasks; and that Plaintiff could work for 4-6 hours a day but would be off task at least 20% of the time during a typical workday and be absent one to two days each month. (*Id.* at 1406-09.)

Meanwhile, in a September 2020 statement, Dr. Mendonca opined that Plaintiff still experienced fatigue, neuropathy, and difficulty focusing as a side effect of his medications. (*Id.* at 1501.) However, Dr. Mendonca indicated that Plaintiff experienced only mild difficulties paying attention or concentrating. (*Id.* at 1504.) Dr. Mendonca also opined

that Plaintiff had moderate limitations providing consistent work effort and would miss about two days of work per month. (*Id.* at 1504.)

### 3. The ALJ's Evaluation of Dr. Mendonca's Medical Opinions

The ALJ found Dr. Mendonca's opinions unpersuasive. (*Id.* at 18.) The ALJ's full rationale was as follows:

> The undersigned finds the opinions of Dr. Mendonca to be unpersuasive, as they appear[] to contain inconsistencies. Particularly, Dr. Mendonca's assessment that the claimant is limited to a sedentary exertional level and is expected to be off task regular[ly], contrasts with his own exams that exhibit normal findings, as well as the fact that the claimant admits no symptoms. For instance, a follow up examination in August 2019 noted that he felt better, denied chest pain, fevers or chills, he was eating better and his energy level improved. He was also looking forward to a vacation. The exam showed that he was in no acute distress, his neck was supple, his chest was clear, his heart was regular, he had no abdominal tenderness, no edema, he was alert and fully oriented and he had no palpable lymphadenopathy (Exhibit 11F). These inconsistencies render[] Dr. Mendonca's opinion less persuasive.

(*Id.*)

### 4. The Parties' Arguments

Plaintiff argues that the ALJ provided insufficient reasons for discrediting the opinions of Dr. Mendonca. (Doc. 10 at 11-12.) More specifically, Plaintiff argues that the ALJ's sole reason for discrediting Dr. Mendonca's opinions was that those opinions were inconsistent with Dr. Mendonca's treatment notes, but the only cited support for this assertion was "a *single* treatment note from August 2019" in which Plaintiff reported feeling better and Dr. Mendonca noted that Plaintiff was not in acute distress. (*Id.*) Plaintiff argues these observations "do[] not mean that [Plaintiff's] ability to perform full-time work activity was restored," simply "represent[] a snapshot of how [Plaintiff] was in that moment, during the examination, and [are] not inconsistent with Dr. Mendonca's opinion as to how limited [Plaintiff] would be if he attempted to perform work activity on a regular and continuing full-time basis." (*Id.*) Plaintiff also contends that his other "treatment records . . . were replete with references to his ongoing symptoms of neuropathy after his chemotherapy, issues with focus, and symptoms of fatigue." (*Id.*, citing AR 813-946, 947-71, 972-1108, 1109-15, 1209-1383, 1461, and 1486-95.)

In response, the Commissioner defends the sufficiency of the ALJ's rationale for discrediting Dr. Mendonca's opinions. (Doc. 11 at 10-13.) First, the Commissioner argues that the ALJ properly discredited Dr. Mendonca's opinions on the ground that they were "internally inconsistent with his own treatment notes." (*Id.* at 12.) In seeming response to Plaintiff's argument that the August 2019 treatment note only represented a momentary instance of improvement, the Commissioner contends that "[s]imilar findings were noted in Dr. Mendonca's treatment records in November 2020, which the ALJ pointed out . . . in his subjective complaint analysis." (*Id.*) Second, the Commissioner argues that the ALJ was also entitled to discount Dr. Mendonca's opinions on the ground that they were "inconsistent with the overall medical evidence." (*Id.* at 12-13.)

In reply, Plaintiff reiterates his earlier argument "that his report of 'feeling better' in one isolated treatment note does not mean that his ability to perform full-time work activity was restored. This note is not inconsistent with Dr. Mendonca's opinion as to how limited [Plaintiff] would be if he attempted to perform work activity on a regular and continuing full-time basis." (Doc. 12 at 5.) Plaintiff also reiterates his earlier argument that his "treatment records . . . were replete with references to his ongoing symptoms of neuropathy after his chemotherapy, issues with focus, and symptoms of fatigue." (*Id.* at 6.)

### 5.   Analysis

As an initial matter, there is no merit to the Commissioner's contention that the ALJ could have discredited Dr. Mendonca's opinions due to their inconsistency with the other medical evidence in the record. It is not the Court's role to consider hypothetical reasons why the ALJ might have rejected a particular piece of evidence or medical opinion— instead, the Court must limit itself to considering the actual reasons provided by the ALJ and evaluating their sufficiency. *Burrell v. Colvin*, 775 F.3d 1133, 1138 (9th Cir. 2014) ("We are constrained to review the reasons the ALJ asserts."); *Bray v. Comm'r of Soc. Sec. Admin.*, 554 F.3d 1219, 1225 (9th Cir. 2009) ("Long-standing principles of administrative law require us to review the ALJ's decision based on the reasoning and factual findings

offered by the ALJ—not *post hoc* rationalizations that attempt to intuit what the adjudicator may have been thinking."). Here, the sole reason provided by the ALJ was inconsistency with Dr. Mendonca's own treatment notes.

Nevertheless, that reason was alone sufficient. Plaintiff does not dispute that an ALJ may discredit a medical source's opinions on the ground that they are inconsistent with the medical source's treatment notes. *Tristan v. Comm'r of Soc. Sec. Admin.*, 2022 WL 1707953, *3 (D. Ariz. 2022) ("Regardless of whether the ALJ's finding of internal inconsistency between the September 2017 notes and the November 2017 assessment is characterized as a flaw of 'consistency' or 'supportability,' it serves as a permissible basis for discounting Dr. Germain's medical opinion under the new SSA regulations.") (citation omitted). Instead, Plaintiff argues that this principle is factually inapplicable here because the August 2019 treatment note was aberrational and Dr. Mendonca's other treatment notes contained findings and observations that were consistent with Dr. Mendonca's opinions. This argument is unavailing because it was rational for the ALJ to conclude that the August 2019 treatment note was not aberrational—as discussed below, an array of Dr. Mendonca's treatment notes spanning a multi-year period reflect that Plaintiff was doing well with treatment and would not be limited in the manner that Dr. Mendonca opined in the assessment forms.

To set the stage, Plaintiff completed his fifth and final round of chemotherapy in July 2019, which he "very well tolerated." (AR at 1165.) Dr. Mendonca's notes from August 29, 2019, state that Plaintiff had a "complete response to treatment." (*Id.*) Additionally, Dr. Mendonca indicated that Plaintiff "overall feels better," was eating better, and had improved energy levels. (*Id.* at 1162.) Plaintiff also denied experiencing breath palpitations. (*Id.*) Dr. Mendonca went over Plaintiff's blood work (CBC, CMP, and LDH), determined that "his counts had recovered," and recommended follow-ups in three-month intervals. (*Id.* at 1165.)

In November 2019, Dr. Mendonca wrote that Plaintiff "states that he has been feeling better, energy level has continued to improve. He is doing a lot more activities, had

been traveling, spending time with family. He denies any fevers, chills, night sweats, unintentional weight loss. Appetite is doing great. . . . He has residual issues with neuropathy, taking gabapentin. No chest pain, palpitations, shortness of breath, cough, GI complaints. . . . He feels well." (*Id.* at 1461.)

In February 2020, Dr. Mendonca wrote that Plaintiff was "doing great without any evidence of disease reoccurrence." (*Id.* at 1458.) Plaintiff reported no shortness of breath and was "overall feeling well," despite mild neuropathy. (*Id.* at 1455.)

On May 13, 2020, Dr. Mendonca wrote that Plaintiff "reports feeling well" and had "weaned himself off gabapentin." (*Id.* at 1450). Dr. Mendonca also wrote that Plaintiff "still has mild neuropathy affecting his toes, which he describes as intermittent, tolerable." (*Id.*) Dr. Mendonca also noted that Plaintiff's blood work was stable with normal LDH and expressed no concerns from that day's evaluation. (*Id.* at 1453.)

In August 2020, Dr. Mendonca wrote that Plaintiff was "doing very well" and "does not have any treatment related side effects other hand residual neuropathy, which is mild." (*Id.* at 1489.) Dr. Mendonca also noted that Plaintiff was off gabapentin and did not wish to retry that medication. (*Id.*)

In November 2020, Dr. Mendonca wrote that Plaintiff was "feeling well" with "no headaches, focal weakness." (*Id.* at 1537.) Dr. Mendonca also wrote that Plaintiff's energy level was "doing well" and he experienced "overall improvement" to his neuropathy. (*Id.* at 1537, 1540.)

As this summary makes clear, the ALJ could have rationally interpreted Dr. Mendonca's treatment notes between August 2019 and November 2020 as showing that Plaintiff responded well to cancer treatment, continuously reported improvement, and suffered only mild neuropathy. Although Plaintiff notes that some of the treatment and other medical records contain indications that Plaintiff suffered from fatigue, neuropathy, and concentration difficulties,[2] it is the ALJ's duty to resolve conflicts in the evidence.

---

[2] Plaintiff cites the following records: AR at 813-946 (hospital records primarily pertaining to Plaintiff's pneumonia, blood work, and gastrointestinal issues); AR at 947-71 (Dr. Mendonca's notes from June 2019 stating Plaintiff "had had some issues with neuropathy and fatigue," although Dr. Mendonca found Plaintiff alert and oriented); AR at

*Reddick v. Chater*, 157 F.3d 715, 722 (9th Cir. 1998). Because the ALJ's determination represents a reasonable interpretation of the record, the Court will not disturb the decision. *Barnhart*, 278 F.3d at 954.

It was also rational for the ALJ to construe the observations in the treatment notes summarized above as inconsistent with, and not providing support for, Dr. Mendonca's opined-to exertional limitations. Finally, although the ALJ only identified one particular treatment note (the August 2019 note) in the portion of the decision explaining why Dr. Mendonca's opinions were unpersuasive, the ALJ made clear (by using the introducing phrase "For instance") that this was not the only treatment note that was inconsistent with Dr. Mendonca's opinions, but merely an exemplar, and cited other treatment notes containing similar observations in other portions of the decision.

Accordingly, the ALJ did not err in discrediting Dr. Mendonca's opinions due to their inconsistency with Dr. Mendonca's treatment notes.

### B. **Plaintiff's Symptom Testimony**

#### 1. Standard Of Review

An ALJ must perform a two-step analysis to determine the credibility of a claimant's pain and symptom testimony. *Lingenfelter v. Astrue*, 504 F.3d 1028, 1035-36 (9th Cir. 2007). First, the ALJ must determine whether the claimant has presented objective medical evidence of an underlying impairment "which could reasonably be expected to produce the pain or other symptoms alleged." *Id.* at 1036. If so, and if there is no evidence of malingering, the ALJ may "reject the claimant's testimony about the severity of [the] symptoms" only by "providing specific, clear, and convincing reasons for doing so." *Brown-Hunter v. Colvin*, 806 F.3d 487, 488-89 (9th Cir. 2015).

…

---

972-1108 (hospital records primarily related to the administration of Plaintiff's chemotherapy injections and bloodwork); AR at 1109-15 (treatment note stating Plaintiff feels quite well except for a bit of neuropathy); AR at 1209-1383 (records from Plaintiff's primary care provider); AR at 1461 (treatment note from November 2019 stating Plaintiff "has residual issues with neuropathy" for which he was taking gabapentin); and AR at 1486-95 (treatment notes from August 2020 stating Plaintiff had "mild, residual neuropathy").

2.     Plaintiff's Symptom Testimony

At the hearing, Plaintiff explained that he stopped working after being diagnosed with Burkitt's lymphoma. (AR at 34-35.) Plaintiff testified that he underwent chemotherapy, which was successful in resolving the lymphoma, but he experienced various "post treatment symptoms" afterward, including brain fog and difficulty following directions. (*Id.*) For example, Plaintiff testified that his ability to "manipulate spreadsheets" has worsened after chemotherapy. (*Id.* at 38-39.) Consequentially, Plaintiff testified that he is no longer able to help his wife manage their finances. (*Id.*)

Plaintiff also reported lower stamina. (*Id.* at 35.) He testified that he attempts to walk a mile a day but needs to stop to rest three-quarters of the way through due to shortness of breath or weakness. (*Id.* at 35, 41.) Plaintiff also testified that he does not have difficulty sitting or breathing (*id.* at 35-36) and no longer needs to use a walker. (*Id.* at 42.)

Plaintiff also testified to continuing issues with neuropathy. (*Id.* at 34, 43.) At the hearing, he testified to feeling numbness on the bottoms of his feet as well as freezing or burning sensations. (*Id.* at 43.) Plaintiff was prescribed gabapentin for these symptoms but testified that it did not help. (*Id.*) Plaintiff testified that his oncologist said the neuropathy was a byproduct of chemotherapy and would eventually go away. (*Id.*) Plaintiff testified that his neuropathy has remained constant since he was first diagnosed. (*Id.* at 44.)

When asked to describe his daily activities, Plaintiff stated that he watches television 8 to 10 hours a day, does household chores like vacuuming and sweeping, goes grocery shopping, runs other errands, assembles jigsaw puzzles, attempts to walk a mile each day, and uses his tablet to shop, check his email, and visit financial websites. (*Id.* at 36-41.) As for the television viewing, Plaintiff clarified that he sometimes forgets what he watched and might need to rewind it, although these occurrences are infrequent. (*Id.* at 41.)

3.     The ALJ's Evaluation Of Plaintiff's Symptom Testimony

The ALJ held that Plaintiff's "statements concerning the intensity, persistence and limiting effects of these symptoms are not entirely consistent for the reasons explained

throughout [the ALJ's] decision." (*Id.* at 17.) The ALJ then identified the following reasons for rejecting Plaintiff's symptom testimony. (*Id.* at 17–19.)

First, the ALJ stated that "there is nothing in the medical evidence suggesting that [Plaintiff] receives treatment" for his impairments "other than medication." (*Id.* at 17.) In support, the ALJ cited treatment notes stating that Plaintiff tolerated chemotherapy well except for some post-therapy neuropathy. (*Id.*). In a related vein, the ALJ identified records suggesting that Plaintiff's various conditions were "mild" or "improved" or "essentially unremarkable." (*Id.*) For example, the ALJ noted that, according to treatment notes, Plaintiff completed chemotherapy in July 2019 and was "doing well" the following month. (*Id.*) The ALJ found this evidence consistent with Dr. Mendonca's statement that Plaintiff's condition was stable, though he still required monitoring. (*Id.*) Similarly, the ALJ found that Plaintiff's neuropathy was "only mild" and had improved by November 2020. (*Id.*) The ALJ also found that Plaintiff's pancytopenia had improved and noted that "despite his sciatica, [Plaintiff] was still able to ambulate without assistance." (*Id.*) As for Plaintiff's hyperthyroidism, hyperlipidemia, and shingles, the ALJ found that Plaintiff did not "experience complications from the above referenced impairments at a frequency and severity consistent with severe impairments." (*Id.*)

Second, the ALJ concluded that although Plaintiff's activities of daily living ("ADLs") "illustrate some functional deficits, they are not to the level of severity related by the [Plaintiff]." (*Id.* at 18.) The ALJ noted that despite Plaintiff's impairments, he "continues to engage in a somewhat normal level of daily activity and interaction. Specifically, the claimant admitted activities of daily living including cooking, washing dishes, completing yardwork, performing light household chores, going swimming, shopping for groceries, walking a mile a day, and carrying/lifting heavy objects." (*Id.*)

Third, the ALJ noted that throughout the medical records, the Plaintiff "is described as well nourished, well developed, cooperative, alert, oriented, and in no acute distress." (*Id.*, citations omitted.) Thus, the ALJ concluded that Plaintiff was "more able-bodied than he alleges." (*Id.*)

4.     The Parties' Arguments

Plaintiff challenges the sufficiency of the ALJ's reasons for discrediting his symptom testimony. (Doc. 10 at 12-14.) Plaintiff essentially makes two arguments in support of this challenge. First, Plaintiff argues that the walking-related activities he described are not inconsistent with his claim of disability because he clarified that he often has to rest partway through the walk and had to use a walker until October 2019. (*Id.* at 13.) Second, Plaintiff argues that the household chores he described are not inconsistent with his claim of disability because he "has difficulty understanding and following instructions and is not able to focus well enough to do simple spreadsheets for the family finances, while spreadsheets used to be a significant part of his paid job." (*Id.*)

The Commissioner defends the sufficiency of the ALJ's rationale for discrediting Plaintiff's symptom testimony. (Doc. 11 at 5-10.) First, the Commissioner argues that the ALJ permissibly found a conflict between Plaintiff's ADLs and Plaintiff's claim of disability because being able to "engage in activities such as cooking, washing dishes, completing yardwork, performing light household chores, going swimming, shopping for groceries, walking a mile a day, and carrying/lifting heavy objects . . . translate[s] into the physical functions required to perform work, such as walking, standing, sitting, lifting, pushing, pulling, reaching, carrying, or handling." (*Id.* at 8-9.) The Commissioner also contends that Plaintiff's testimony regarding his ADLs was inconsistent with Plaintiff's symptom testimony because "Plaintiff contends he is unable to remember directions" but driving, using a tablet for online shopping, and using a tablet to check balances and expenditures on financial accounts are all "activities that require the ability to remember and follow directions and sustain focus." (*Id.* at 9.) Similarly, the Commissioner contends that Plaintiff's clarifications regarding his walking limitations "have no merit" because "Plaintiff can ambulate without assistance." (*Id.* at 9-10.) Finally, and separate from the issue of ADLs, the Commissioner argues that the ALJ also permissibly discounted Plaintiff's symptom testimony due to (1) inconsistency with the medical evidence and (2) the effectiveness of treatment and/or Plaintiff's unexplained failure to seek treatment for

his symptoms. (*Id.* at 7-8.)

In reply, Plaintiff simply repeats his earlier argument that "the activities of daily living cited by the ALJ are not inconsistent with [Plaintiff's] statements that he is unable to remember directions or sustain focus well enough to perform work activity." (Doc. 12 at 7.)

### 5. Analysis

The Court finds no harmful error in the ALJ's evaluation of Plaintiff's symptom testimony.

As an initial matter, one of the reasons the ALJ provided for discrediting Plaintiff's symptom testimony was that Plaintiff experienced improvement from treatment and thereafter (and without explanation) stopped seeking treatment. This is, in general, a valid reason under Ninth Circuit law for discrediting a claimant's symptom testimony. *Larsen v. Kijakazi*, 2022 WL 1537365, *1 (9th Cir. 2022) ("The ALJ provided specific, clear, and convincing reasons to discount Larsen's testimony because . . . his symptoms improved with treatment [and] there was an unexplained absence of treatment for a portion of the closed period . . . ."); *Molina v. Astrue*, 674 F.3d 1104, 1112 (9th Cir. 2012) ("[T]he ALJ may consider . . . [an] unexplained or inadequately explained failure to seek treatment or to follow a prescribed course of treatment . . . .") (citations omitted); *Tommasetti v. Astrue*, 533 F.3d 1035, 1040 (9th Cir. 2008) ("The record reflects that Tommasetti responded favorably to conservative treatment . . . [which] undermines Tommasetti's reports regarding the disabling nature of his pain."); *Fair v. Bowen*, 885 F.2d 597, 603 (9th Cir. 1989) ("[A]n unexplained, or inadequately explained, failure to seek treatment or follow a prescribed course of treatment . . . can cast doubt on the sincerity of the claimant's pain testimony."). However, Plaintiff makes no effort to address this reason in his brief—all of Plaintiff's arguments are focused on the sufficiency of one of the ALJ's other proffered reasons (inconsistency with ADLs) for discrediting his testimony.

Similarly, another of the ALJ's proffered reasons for discrediting Plaintiff's symptom testimony was that it was inconsistent with the medical evidence in the record.

It is permissible for an ALJ to rely on such inconsistency as one (albeit not the sole) basis for discounting symptom testimony. *Smartt v. Kijakazi*, 53 F.4th 489, 498 (9th Cir. 2022) ("Claimants like Smartt sometimes mischaracterize [Ninth Circuit law] as completely forbidding an ALJ from using inconsistent objective medical evidence in the record to discount subjective symptom testimony.  That is a misreading of [Ninth Circuit law].  When objective medical evidence in the record is inconsistent with the claimant's subjective testimony, the ALJ may indeed weigh it as undercutting such testimony.  We have upheld ALJ decisions that do just that in many cases."); *Rollins v. Massanari*, 261 F.3d 853, 856 (9th Cir. 2001) ("While subjective pain testimony cannot be rejected on the sole ground that it is not fully corroborated by objective medical evidence, the medical evidence is still a relevant factor in determining the severity of the claimant's pain and its disabling effects.").  However, by limiting all of his credibility-related arguments to the subject of ADLs, Plaintiff again makes no effort to address one of the bases for the ALJ's ruling.[3]

Given these determinations, it is arguably unnecessary to decide whether the ALJ's third proffered reason for discrediting Plaintiff's symptom testimony—inconsistency with ADLs—was also supported by substantial evidence. *Molina*, 674 F.3d at 1115 ("[S]everal of our cases have held that an ALJ's error was harmless where the ALJ provided one or more invalid reasons for disbelieving a claimant's testimony, but also provided valid reasons that were supported by the record."); *Carmickle v. Comm'r, Soc. Sec. Admin.*, 533 F.3d 1155, 1162-63 (9th Cir. 2008) ("Because we conclude that two of the ALJ's reasons supporting his adverse credibility finding are invalid, we must determine whether the ALJ's reliance on such reasons was harmless error. . . .  Here, the ALJ's decision finding

---

[3]     The ALJ's finding on this point was, at any rate, supported by substantial evidence. For example, although Plaintiff testified that his neuropathy "has not gotten any better or worse" and was instead "constant" (AR at 44), Dr. Mendonca wrote in November 2020 that Plaintiff experienced "overall improvement" to his neuropathy. (*Id.* at 1537, 1540.) Similarly, although Plaintiff testified that he runs out of breath when attempting to walk one mile (*id.* at 35), Dr. Mendonca's treatment notes from February 2020 state that Plaintiff denied shortness of breath. (*Id.* at 1455, 1461). The ALJ also noted that, despite Plaintiff's assertion that his brain fog has affected his focus and concentration, Plaintiff did not receive a diagnosis or treatment for this alleged impairment. (*Id.* at 34-35.)  Additionally, Plaintiff's healthcare providers described him as "alert and oriented." (*Id.* at 837, 985.)

Carmickle less than fully credible is valid, despite the errors identified above."). Nevertheless, in an abundance of caution, the Court clarifies that that reason, too, was legally valid and supported by substantial evidence. *Cf. Burch v. Barnhart*, 400 F.3d 676, 680-81 (9th Cir. 2005) ("In considering Burch's testimony regarding her daily living, the ALJ explained that her daily activities 'suggest that she is quite functional. She is able to care for her own personal needs, cook, clean and shop. She interacts with her nephew and her boyfriend. She is able to manage her own finances and those of her nephew.' Although the evidence of Burch's daily activities may also admit of an interpretation more favorable to Burch, the ALJ's interpretation was rational, and '[w]e must uphold the ALJ's decision where the evidence is susceptible to more than one rational interpretation.") (citation omitted).

  C. **Step-Two Severity Characterization**

    1. <u>Legal Standard</u>

At step two of the sequential evaluation process, the ALJ must determine whether the claimant suffers from a "severe" impairment or combination of impairments. *Smolen v. Chater*, 80 F.3d 1273, 1290-91 (9th Cir. 1996). In general, "[t]he step-two inquiry is a de minimis screening device to dispose of meritless claims." *Id.* at 1291. "[A]ny impairment or combination of impairments which significantly limits [a person's] physical or mental ability to do basic work activities" is considered "severe." 20 C.F.R. § 404.1520(c). "Basic work activities are 'abilities and aptitudes necessary to do most jobs, including, for example, walking, standing, sitting, lifting, pushing, pulling, reaching, carrying or handling.'" *Smolen*, 80 F.3d at 1273 (citation omitted). "An impairment or combination of impairments may be found not severe *only if* the evidence establishes a slight abnormality that has no more than a minimal effect on an individual's ability to work." *Webb v. Barnhart*, 433 F.3d 683, 686 (9th Cir. 2005) (quotation marks omitted).

The step-two inquiry also calls for an evaluation of the duration of the impairment or impairments. "Unless [the] impairment is expected to result in death, it must have lasted or must be expected to last for a continuous period of at least 12 months." 20 C.F.R.

§ 404.1509.

In determining the severity of the impairments, the ALJ considers the claimant's testimony, treatment notes, imaging, reports of daily activities, opinion evidence, and any other statements or observations in the record. 20 C.F.R. § 404.1529(a).

### 2. The ALJ's Step-Two Severity Evaluation

The ALJ's step-two severity analysis was largely driven by the ALJ's decision to discredit Plaintiff's symptom testimony and Dr. Mendonca's opinions for the reasons stated above. In contrast, the ALJ deemed "persuasive" the opinions of the two state agency consultants, both of whom "opined that the claimant's impairments are nonsevere." (AR at 18-19.)

The ALJ also offered several observations regarding the chronology of Plaintiff's medical treatment. More specifically, the ALJ noted that Plaintiff was diagnosed with Burkitt's lymphoma in December 2018 and began chemotherapy at that time; completed chemotherapy by July 2019; was described as "doing well" and posing "no concerns" in August 2019; and experienced only "mild" neuropathy" in the period that followed, which was treated by gabapentin (which Plaintiff stopped taking in November 2020). (*Id.* at 17.)

### 3. The Parties' Arguments

Plaintiff's essential argument is that the ALJ's non-severity finding at step two is erroneous because it conflicts with Dr. Mendonca's opinions and his symptom testimony, both of establish that his "lymphoma and the residual effects of chemotherapy do continue to result in significant limitations in [his] ability to perform basic work activities and are therefore severe impairments." (Doc. 10 at 5-9.)

In response, the Commissioner argues that the ALJ properly discredited Dr. Mendonca's opinions and Plaintiff's symptom testimony. (Doc. 11 at 5.) The Commissioner also contends that "Plaintiff failed to demonstrate that his impairments met the 12-month durational requirement at step two." (*Id.*)

In reply, Plaintiff argues that the ALJ did not rely on the step-two durational requirement of 12 months and that "[t]he ALJ's rationale was that the impairments did not

result in significant work-related limitations." (Doc. 12 at 2.) Plaintiff then reiterates his earlier argument that both Dr. Mendonca's opinions and his symptom testimony show that any such severity determination was erroneous. (*Id.* at 2-4.)

### 4. Analysis

Plaintiff has failed to establish that the ALJ erred when making the step-two finding of non-severity.

First, and most important, all of Plaintiff's arguments on this issue seem to be derivative of his challenges to the ALJ's evaluation of Dr. Mendonca's opinions and his symptom testimony. But for the reasons discussed in Parts IV.A and IV.B above, Plaintiff has failed to establish any harmful error as to those issues. Nor does Plaintiff challenge the ALJ's decision to credit the opinions of the two state agency consultants, both of whom opined that Plaintiff's impairments were non-severe within the meaning of the Act. Thus, on this record, substantial evidence supports the ALJ's step-two finding of non-severity.

Second, and alternatively, it is also rational to construe the ALJ's decision as a determination that, even if Plaintiff's impairments were severe for a period of time, they did not remain severe for the minimum period of 12 months necessary to satisfy the step-two durational requirement. Admittedly, the ALJ did not phrase the conclusion in these precise terms, but the ALJ made a point of emphasizing the chronology of Plaintiff's treatment (under which chemotherapy began in December 2018 and Plaintiff's associated symptoms became mild and under control by August 2019) and noted in the heading of the step-two analysis that Plaintiff did "not have an impairment or combination of impairments that has significantly limited (or is expected to significantly limit) the ability to perform basic work-related activities *for 12 consecutive months*." (AR at 17, emphasis added.) It is unfortunate that the ALJ was not clearer on this point, but "[w]here the evidence is susceptible to more than one rational interpretation, one of which supports the ALJ's decision, the ALJ's conclusion must be upheld." *Thomas*, 278 F.3d at 954. Also, as discussed above, this is merely an alternative ground for affirming the ALJ's step-two determination. The other ground does not turn on the durational requirement.

Accordingly,

**IT IS ORDERED** that the decision of the ALJ is **affirmed**. The Clerk shall enter judgment accordingly and terminate this action.

Dated this 26th day of June, 2023.

Dominic W. Lanza
United States District Judge